## VAN TRESS et al. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. October 5, 1923.)

No. 3600.

**1. Conspiracy ☞47—Evidence as to misrepresentations in prosecution for conspiracy to use mails to defraud insufficient to sustain conviction.**

In the prosecution of the manager, officers, and salesmen, of a concern for conspiring to use the mails to defraud, in violation of Penal Code, § 37 (Comp. St. § 10201), in which it was claimed that the defendants induced persons by means of fraud to enter into contracts appointing the concern their agent in the purchase of Indian lands, evidence as to several instances of misrepresentations by salesmen as to the land values *held* insufficient to sustain conviction; the charge being conspiracy, and the salesmen being guilty, notwithstanding such misrepresentations, only if they participated in the conspiracy.

**2. Conspiracy ☞24—In prosecution for conspiring to use mails to defraud, one of the alleged conspirators could not be convicted on evidence showing him to be sole actor.**

In the prosecution of the manager, officers, and salesmen of a concern for conspiring to use the mails in executing a scheme to defraud, in violation of Penal Code, § 37 (Comp. St. § 10201), in which it was claimed that the defendants induced persons by means of fraud to enter into contracts appointing the concern their agent in the purchase of Indian lands, the manager could not be convicted on evidence showing that he was the sole planner and actor; the charge being conspiracy.

**3. Conspiracy ☞48—Denial of directed verdict not error, if there is evidence supporting a subsidiary theory.**

In a prosecution for conspiracy to use the mails to defraud, in violation of Penal Code, § 37 (Comp. St. § 10201), the denial of defendant's motions for a directed verdict would not have been error, even though there was no substantial evidence to support the theory of guilt charged in the indictment and maintained during the trial, if there was evidence supporting a subsidiary theory of guilt, which could fairly be deduced from the indictment, and which had been fairly developed during the trial and was distinctly submitted to the jury.

**4. Conspiracy ☞48—Evidence of conspiracy to use mails to defraud held insufficient for jury.**

In the prosecution of the manager, officers, and salesmen of a concern, for conspiring to use the mails in executing a scheme to defraud, in violation of Penal Code, § 37 (Comp. St. § 10201), in which it was claimed that the defendants induced persons by means of fraud to enter into contracts appointing the concern their agent in the purchase of Indian lands, evidence *held* insufficient for submission of case to jury.

In Error to the District Court of the United States for the Western Division of the Southern District of Ohio; Howard C. Hollister and John W. Peck, Judges.

Roy Van Tress and others were convicted of conspiring to use the mails in executing a scheme to defraud, and they bring error. Judgments and sentences vacated, and case remanded for new trial.

Charles C. Benedict, of Cincinnati, Ohio, and Timothy T. Ansberry, of Washington, D. C., for plaintiffs in error.

James R. Clark, Sp. Asst. Atty. Gen., for the United States.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge. Van Tress and 15 others, plaintiffs in error, were convicted of conspiring to use the mails in executing a

scheme to defraud, and thus violating section 37 of the Penal Code (Comp. St. § 10201). In the fall of 1917, as had been done in previous years, the United States was to sell a large number of tracts of Indian lands in southeastern Oklahoma. Van Tress, through the medium of a corporation controlled by him, the Real Estate Exchange, had been and was engaged at Cincinnati, Ohio, and McAlester, Okl., in a general real estate business, with particular attention to these Indian lands. Defendants Hiatt and Williams were officers of the Exchange, and active in the general conduct of its business. The other defendants were salesmen.

The general plan of the Exchange, in this part of its business, was to procure from prospective investors throughout the country contracts by which the Exchange was made agent for the investor to buy a tract of these lands. The investor was to advance the money, and the Exchange was to receive compensation for its services in locating and securing a tract and attending to the details of the purchase. This general method of doing this business had been followed by the Exchange for several years. To attract investors and induce the making of these agency contracts, it maintained a considerable number of railroad cars. Each of these was fitted up with maps, photographs, literature, and samples of Oklahoma agricultural products. The practice was to send one of these cars, accompanied by salesmen, into a city and advertise the plan in the local newspapers. Those who were persuaded by what they thus saw and by the salesmen's arguments executed agency contracts, made initial payments, and the car moved on to another town. A form of these agency contracts is given in the margin.[1]

---

[1] McAlester Real Estate Exchange.

Contract for Indian Land Locating Service.

This agreement, made and entered into by and between the McAlester Real Estate Exchange, of McAlester, Oklahoma, party of the first part, and ————, party of the second part, witnesseth, that party of the first part is engaged in the business of locators, attorneys and engineers, for the purpose of representing nonresident investors in the purchase of Indian lands from the United States government, the government acting as agent for the Indians.

Party of the first part represents that it has a corps of competent engineers who are thoroughly familiar with the topography and general classification of the lands; that it has in its employ an efficient and competent geologist who is familiar with the land to be sold from a geological standpoint; that it has also in its employ expert land buyers, who have had years of experience in connection with Indian land sold by the United States government; that it maintains oil and gas drilling crews and sinks its own wells for its customers; also operates its own saw mills, thereby marketing its customers' timber, and further maintains a leasing and selling department for leasing and selling lands purchased through its service.

Party of the first part guarantees the Indian lands, herein referred to, to be mixed lands of various classifications, located in a section of Oklahoma that is rich in mineral possibilities, such as oil, gas, iron, coal, asphalt, building stone, lead, zinc and clays and shales, and further contains fine timber, farming and grazing conditions, with forty inches of rainfall and well watered.

Now, therefore, in consideration of the above representations, the party of the second part hereby employs the party of the first part to act as his or her agent to secure approximately ———— acres of land, when sold at public auction by the United States government, for the benefit of the Choctaw and Chickasaw Indian Tribes or, privately, the equity therein.

It is not claimed that the Exchange was not financially responsible, or that it intended to or did convert to its own use any of the moneys

For and in consideration of the sum of ($135.00) one hundred and thirty-five dollars, the receit of which is hereby acknowledged party of the first part agrees to represent second party in the purchase of Indian land from the government at their land sales; it being specifically understood that in doing so they merely act as agent and attorney, *and are in no way connected with the government, nor have they any preferential rights concerning said lands* —their services to consist of locating and securing data on a number of tracts of land as per second party's specification hereinbelow set forth, and to send to second party maps, plats and photographs descriptive of same thirty days before date of sale, and further to purchase for said second party at said government public auction sales, or privately, an equity in government lands, as specified, and at the price set forth, in said second party's land specification, or cancel this contract and return all money paid thereon.

It is further agreed that the amount of money above receipted for shall include the following leasing services, that is, said first party will submit for approval of second party one or more leases of the following description on any and all lands purchased through the fulfillment of this contract, namely: Oil, gas, farming, timber or grazing leases, securing for same the best price obtainable, or will sell said lands prior to date of next government payment due thereon, netting second party a profit sufficient to reimburse him or her for all money paid for the above-mentioned service, in addition to the amount paid the government, plus six per cent.

It is further provided that party of the second part agrees to comply with all the obligations and requirements of the Interior Department, and said first party hereto.

Party of the second part agrees to mail to the general offices of party of the first part at least ten days prior to date of sale a certified check for twenty-five (25) per cent. of the maximum amount required as per second party's land specifications, hereinbelow set forth, and made payable as hereinafter designated by said party of the first part.

Party of the second part further agrees to furnish party of the first part with the power of attorney hereto attached at least ten days before the sale, authorizing party of the first part to represent party of the second part at such sale.

If party of the second part does not comply with the terms of this agreement, he shall forfeit all rights and claims he may have by virtue of this contract to party of the first part.

Party of the second part has entered into and signed this contract solely upon the information contained herein and the literature of said party of the first part and not otherwise.

Both parties hereto mutually agree that agricultural land can not be secured through the services of said first party for less than ten dollars per acre; timber land no less than four dollars, and grazing land no less than three; and both parties further understand that no specific amount of lease money can be guaranteed on any lands purchased.

This contract, made and entered into this ——— day of ———, ———.

### Second Party's Land Specifications.

McAlester Real Estate Exchange:

Look up location of land that will compare favorably with the following description:

Amount of land desired, ———.

Character of land: Agricultural, ———; grazing, ———; timber, ———, at a price not to exceed ——— dollars per acre.

Number of miles from a marked town ———.

If agricultural land, I want timber for domestic purposes in the quantity of ——— per cent.

If timber land, I want ——— per cent. suitable for cultivation when cleared.

it received, excepting its own agreed compensation.[2]   It is not easy to deduce from the 130 printed pages of the indictment just what the scheme to defraud was which underlay the conspiracy for which the respondents were to be tried. The case took several weeks to try, and 5,000 pages of testimony (which have been abstracted into 500) from over 100 witnesses did not tend to clarify the issue; but, if we disregard the rule which forbids going to the statement of overt acts to supplement the statement of the plan, and use the overt acts and the testimony to help out, it may be inferred that the primary fraud, upon which the prosecution was intended to be based, lay in so misrepresenting the character of these lands and the nature of the agency contract as to induce investors to enter into contracts when they would not have done so, except for the misrepresentation, and to do this for the sake of the agency commission which would be received.

Against this view of the indictment is the fact that during the season of 1917 about 2,800 contracts were procured and kept in force, all under the same general plan and scheme, and about 2,300 were carried through to completion by transfers of Indian lands, delivered along in the fall of 1917, leaving 493 which were completed by assignment and transfer early in 1918, and the indictment alleges that the plan was to defraud these 493 purchasers—naming them—and does not claim any plan to defraud the other 2,300. However, perhaps this does not prevent the theory that fraud is to be found in the original plan, as it ultimately took effect upon them, to induce these 493 to make their agency contracts. Therefore we proceed to consider the case from that aspect.

We must first eliminate from consideration an occasional false statement made by one or another car salesman in talking with his prospective customers. This prosecution is not one against the salesman who made such false statements. It is against the Exchange and its managers and its salesmen all together for conspiracy to make such statements. There is always danger in any selling plan of general scope that individual salesmen may transgress in this particular. The Exchange guarded against it as far as possible by most explicit provisions in the contract that it stood responsible only for the statements made in its own literature, and that all others were unauthorized. In repeated instances where the customer seemed to have good ground for his complaint of specific false statements or misleading, the agency refunded the amount received. It would seem, so far as this record goes, that it had so refunded in every such case or was in the course of doing so; and, manifestly, in a few sporadic instances of such misleading in connection with such general treatment of this character of complaint, there was no substantial basis for concluding that all the parties were engaged in a common conspiracy to have the salesmen do these forbidden things.

Coming to the representations contained in the literature, or otherwise authorized by the managing defendants: We notice first the com-

If grazing land, I want ―――― per cent. suitable for cultivation and timber for domestic purposes.

[2] While this statement is thought to be accurate, it is not intended to overlook some specific claims hereafter mentioned.

plaint that there was a fraudulent holding out of a prospect that oil would be found upon the land. The evidence does not support any conclusion of intent to defraud in this particular. There was no statement that any of the lands were within any proved oil district; it was said that they were in the general northeast and southwest line running from Arkansas through Oklahoma into Texas in which there had been oil developments; that there were known oil fields in all four directions, and that the ultimate finding of oil on some of these lands was a possibility to be taken into account in estimating their future value. This was true; and no intelligent person would buy or sell lands in that region without having this more or less remote possibility in mind. It was legitimate to call it to the attention of prospective purchasers as the Exchange did, as one inducement to buy these lands when they could be had for $3 to $7 an acre. Indeed, in the arguments before us, the attack upon this feature of the literature settles down to the claim that the official geological reports indicated the improbability of the existence of oil in paying quantities southeast of a described geological fault line, while the lands finally located for the 493 claimants were upon the barren side of this line; but it is familiar knowledge that oil has often been found where the supposed geological conditions were thought unfavorable. There are at least some evidences of oil southeast of this line, and the suggestions made by the managers upon this subject cannot in fairness be thought of as fraudulent. They did not go, to any fraudulent degree, beyond the official advertising of the Indian Department in 1918, which said, with reference to lands adjacent to those sold in 1917, "Prospective values for oil or gas." The official regulations for 1917, covering all lands to be sold on both sides of this fault line, included prohibitions against drilling for oil until all deferred payments were made.

Another complaint much referred to is that the investors were led to suppose they were dealing with the government. This claim is based upon newspaper advertising used to get people to the cars. The land to be sold was "Indian land" or "government Indian land." The title was in the United States, in trust for the Indians, and, when full payment was made, deeds would come from the government and the Indians. The car advertisements were sometimes headed "Indian land car" or "government Indian land car." Standing alone, this might mislead. It might even be conceded that there was intentional misleading in this respect for the purpose of provoking immediate attention; but that cannot justify a conviction of conspiracy under this indictment. The intention and the practice were to remove any such impression before any contracts were made. There had been complaint upon this subject in previous years, and to guard against any danger that such impression should abide, if it had arisen, the contract expressly set out that the Exchange was employed as the agent of the investor in selecting Indian lands, while the government itself acted as agent for the Indians, and the contract further set out prominently and in large type that the Exchange managers "are in no way connected with the government, nor have they any preferential rights concerning said lands." In the face of such a contract there is no room for the

inference that the Exchange intended to have the investors continue to believe that it was a government agency.

Complaint is also made because the investors were led to believe they were to be located upon lands to be sold at public sale in October, 1917, while the intent was to give many of them lands procured by private sale. Van Tress' statement on this subject—and the main facts do not seem to be disputed—is that he expected that about 3,000 tracts would be offered at public sale in the fall of 1917; that early in the spring of 1917 his own selling campaign was so progressing that, after making allowance for the large number of contract investors who would default when the 25 per cent. payment was called for, still he would have more contracts than he could expect to place through the medium of the public sales; that there were large amounts of the same general land interspersed and scattered through the same localities, which were still for sale by the government, because they had not been sold at previous public sales, or which were for sale by the first purchasers, who had made one or two annual payments, but wished to sell and transfer their equities. These lands were all Indian lands of the same general character, the title to all of them was still in the government and the Indians, and the deeds, when made, would come from the government and the Indians.

Upon these facts, Van Tress concluded that it would make no difference to the contract investors whether their title came directly through an auction sale in 1917, or indirectly through a government sale of a previous year. He therefore inserted in all his contracts, after the spring of 1917, and in all the 493 upon which this indictment is based, the clause found in the contract in the margin "or privately, the equity therein," and in the next paragraph the words "or privately an equity in." In July the contract was again changed, so as to permit also the private purchase of "Indian lands adjacent and equivalent thereto," even if the interest to be purchased was the whole interest and not an equity. Even if this intention to supply by private sale what he could not get at auction had been kept by Van Tress to himself, it is not easy to see how there could have been such prejudice to any investor as could have made the scheme criminal; but the intent was declared in the plainest words on the face of the contract, and there could be nothing fraudulent about the mere extension of the plan to include another group of the same type of lands. It is not without importance in this connection to observe that during 1916 complaint against the Exchange had been under consideration by the Post Office Department; that the department probably understood the complaint to be still pending; that this new form of 1917 contract was submitted by Van Tress to the solicitor of the department with his full explanation, and that no objection was made to it.

It is also urged that it was fraudulent to continue selling these contracts in greater numbers than could be placed. We discover no evidence that would justify the conclusion that any one of the defendants had reason to believe that more contracts were being sold than could be placed, with the aid of the private sale provisions. Indeed, the complaint as to the last batch of contracts is that they were im-

properly placed upon privately purchased lands, where the quality was insufficient, or the title bad, or both.[3]

[1] The complaint is also made that it was part of the fraudulent scheme to misrepresent the agricultural, grazing, and timber values of the lands as a class. We find no evidence justifying that conclusion. The lands were understood to be wild and uncultivated. They were to be purchased at not more than $10 per acre, and usually not more than $5. Their chief value was, of course, speculative, depending mostly on the growth and development of the country. There is evidence tending to show several instances of fraudulent overstatements by salesmen; but when we consider that the charge is that the management conspired to make sales by these means, and that the salesmen were guilty only if they participated in such general conspiracy, we agree with the opinion, which is said to have been expressed by the trial judge, that in so far as the prosecution rested upon this theory of guilt it must fail.

Several other theories of fraud are opened by the evidence and more or less argued. We will not review them in detail. We have discussed those we think the most forceful, and we conclude that there was no evidence, sufficient to go to the jury, supporting the theory of a fraudulent conspiracy and based upon any matters which occurred down until about the time of the public sales in October. The transactions which occurred after that time and which have direct connection with the 493 contract holders alleged to be defrauded, and not with all the others, have to do with the so-called Buschow lands, and must be further considered.

The public sales lasted from October 15th to 31st; 3,700 tracts were listed for sale. At that time the Exchange had 2,800 contract holders, who had kept their contracts alive by making the first payment. The Exchange bought for its customers about 1,300 tracts at the public sales, leaving 1,500 tracts to be placed through private sales. Of these it seems that all but 493 were located by purchases and assignments about which there were no complaints, so far as this record shows.

A year or two before, the Buschow Lumber Company had purchased and assembled a tract of 41,000 acres of these Indian lands, which it desired for the purpose of cutting off the timber, and upon which it had made the first payment to the government. About November, Van Tress, in his own name, took an option to purchase this tract from the Buschow Company, at an average price of about $4 per acre, reserving to the Buschow Company the timber and several years' time in which to take it off, and paid to that company the amount— about $25,000—which it had paid on the purchase price. He then proceeded to assign to the remaining 493 customers tracts of this Buschow land, and, as there was not enough of it to go around, in many

[3] As it turned out, and assuming that fully half of the final 493 were given duplicate assignments, it would seem that lands were found for more than 90 per cent. of the contract holders who made the first purchase price payment. During the public sales, 3,700 tracts were offered, and Van Tress had only 2,800 live contracts.

instances, if not in most, he assigned the same tract to two different customers and sent to each a certificate of purchase.[4]

On its face this transaction seems fraudulent; if the issue involved were submitted to a jury, it might or might not accept Van Tress' explanation as sufficient to clear him of fraudulent intent. This explanation is that the Buschow tract was entirely suitable to fill such of the contracts as did not specify timber; that it was rumored in Oklahoma that the Exchange was short in its land supply, and would be compelled to buy largely in order to meet its contracts; that, if he had had gone immediately into the market for the necessary additional land, the market prices would have gone up $2 or $3 an acre; that it was better for his customers, as well as for him, to wait a few months and dissipate the impression that he was forced to buy; that to close the matter up and return the money of those who were not located would cause more trouble and complaint than the alternative course which he adopted; that every certificate of purchase given to the 493 gave the purchaser the right to reject the land and get another location, if upon personal inspection he was not satisfied, and gave to Van Tress the right to cancel the certificate and substitute other land, if he wished, thus furnishing the means by which he would later cure the duplications; and that he always intended as promptly as possible to furnish every customer a proper and sufficient tract.

So far as the Buschow lands are concerned, it is claimed that they were of such quality that it was always fraudulent to intend to use them in satisfaction of these contracts. Besides Van Tress, perhaps defendant Williams had advance knowledge of this intent. We observe nothing to indicate that any of the other defendants had any such knowledge. Whether the fraudulent character of this intent can be predicated upon the nature of the lands, and which of the defendants, besides Van Tress, if any, had sufficient knowledge of this nature and of the intent to use to charge them with notice of the fraud, we do not undertake to consider. If there is another trial, the record in this respect may be different. So as to the subject of locating upon this Buschow tract contracts which called for timber land, whether any defendant other than Van Tress should be chargeable with any knowledge of his intent to make such location we have not considered. We observe no proof to that effect.

As to the duplications themselves, we find nothing in the record to indicate that the making of them, or the plan to make them, was known to, or suspected by, any one of the defendants excepting Van Tress. The general office of the Exchange in Cincinnati was in charge of Hiatt. Van Tress had a separate and private office on another floor.

---

[4] In this connection, we find what seems to be the sole instance where Van Tress took—at least temporarily—a profit beyond the compensation given by the contract. The average total price per acre of the Buschow land to him was to be $3.84. The certificates of purchase charged against the contract holders a price of $4.25 as to some, and $4.75 as to others—an average increase of 66 cents per acre. Van Tress' explanation is that this excess charge was in anticipation of new taxes or other unknown items that might develop, and that upon the making of the further payments, and the final accounting, any temporary overcharge would have been rectified.

All the work of assigning the contracts and sending out the certificates to the contract purchasers was done from Van Tress' private office. The actual assigning, including the duplications, was done by Winterfelt, who was not indicted or charged as a conspirator. Whether any correspondence indicating the duplications would come into the general office under Hiatt's supervision is a matter of surmise.

[2] If the issue of fraud on the part of Van Tress in continuing his plan during its last stages, and holding onto his customers' money through duplicate assignments, had been clearly and distinctly submitted to the jury, and he had been convicted, an appellate court, upon this record, could not interfere; but this was not done. He was not indicted for using the mails in a scheme to defraud. All the defendants were charged with conspiracy; as to the greater part of the matters charged in the pleadings and submitted to the jury, and as to the most of the defendants, there was no substantial evidence; as to the inquity of the original plan to use the Buschow lands, and whether there was sufficient cause for submission of this theory, we do not decide; and as to the two features in which a strong prima facie case was made against Van Tress (the duplications and the locating of timber contracts), it does not appear in the record that any other defendant participated in planning or executing, and Van Tress cannot be convicted of conspiracy in a matter in which he is the sole planner and actor disclosed.

We do not consider whether he might rightly be convicted, under this indictment, of conspiracy with Winterfelt, on the theory that Winterfelt was one of the "divers other persons to the grand jury unknown," who, in this indictment, as usually, are said to have conspired with the defendants named. No such issue was submitted to the jury. On the contrary, the jury was expressly charged that it could convict only if it found guilty concert between Van Tress and one or more of the others indicted. Its verdict, therefore, could not have been based on a finding that Van Tress and Winterfelt conspired. Nor do we think the statement by Jeffcott, admitted against him alone, sufficient to justify his conviction by himself. It is by no means a confession.

[3, 4] The motions for a directed verdict were based upon the claim that there was no substantial evidence to support the theory of guilt charged in the indictment and maintained during the trial. Even if there were no such evidence, it would not be error to deny such motions, if there were evidence supporting a subsidiary theory of guilt which could fairly be deduced from the indictment, and if that theory had been fairly developed during the trial and was distinctly submitted to the jury. In this case the theory of indictment and trial was that the 493 contracts, or some of them, were originally procured by conspiracy involving fraudulent means of procurement, or fraudulent intent not to carry them out. There was no substantial evidence supporting this theory; every fair inference justified by the evidence was to the contrary. Upon our present analysis of the record, long after the trial, we see that there lurked in the indictment and proof the subsidiary theory that, though the taking of these contracts involved no criminal conspiracy, one might later have come into existence, first,

when it was determined to use the Buschow lands at all if, in truth, they were wholly unfit; second, when it was determined to locate upon those lands contracts which called for timber; and, third, when it was determined to duplicate locations.   This subsidiary theory was not developed in the hearing, and Van Tress and his associates were not tried for it; and it was so far from being submitted to the jury as a theory of guilt that the jury was instructed that the defendants could not be convicted for conspiring to do these later things, but that they were of importance only as evidence of the original intent when the contracts were taken.   Upon such a record it was prejudicial error not to grant the motions for a directed verdict.

Many allegations of error are made as to rulings occurring during the trial.   We do not pass upon these.   Upon another trial they may or may not have the same aspect.

All the judgments and sentences are vacated, and the case remanded for such new trial as may be desired.